(No. 5037. June 7, 1928.)

WILLIAM UDELAVITZ and SAMUEL UDELAVITZ, Copartners, Doing Business Under the Firm Name and Style of the TWIN FALLS JUNK HOUSE, Respondents, v. IDAHO JUNK HOUSE, ANNA KOPPEL, Doing Business Under the Firm Name of IDAHO JUNK HOUSE, ANNA KOPPEL, HARRY KOPPEL, Proprietor of the IDAHO JUNK HOUSE, HARRY KOPPEL, M. SLATKIN, W. A. CLAUDIN, and ELIDGE HOLTERMAN, Appellants.

[268 Pac. 15.]

Barber & Barber and S. L. Hodgin, for Appellants.

Bothwell & Chapman, for Respondents.

T. BAILEY, LEE, J.—This is a suit for injunction and damages based upon an alleged violation of the state anti-trust law. William and Samuel Udelavitz, plaintiffs and respondents, have been conducting a junk business in Twin Falls since April 12, 1923. About January 1, 1924, the defendant and appellant, Anna Koppel, who owned the Idaho Junk House in Boise, established a branch thereof in Twin Falls. The Boise and Twin Falls houses were respectively managed by Harry Koppel, her son, and Mandel Slatkin, her brother, co-defendants and appellants.

Plaintiffs charged in their complaint that since opening the Twin Falls house, "the said defendants and each of them have combined and conspired and have given direction or authority, each to the other, to do and commit the acts hereinafter alleged for the purpose of driving out of business the plaintiffs herein engaged in the junk business at Twin Falls." The acts alleged were that the de-

fendants "have wrongfully and maliciously endeavored to destroy plaintiffs' said business and to compel plaintiffs to abandon the same and to drive plaintiffs out of said junk business at Twin Falls; that to that end the defendants have persistently and systematically paid more than the market price for junk at and in the vicinity of Twin Falls where they were in competition with the plaintiffs." By reason of such acts plaintiffs claimed they had been unable to conduct their business at a profit during the years 1924 and 1925, to their damage in the sum of $6,250, reckoned at a profit loss of $250 per month. They prayed treble damages, injunctive relief and attorney's fees. Defendants denied any intention to drive plaintiffs out of business, denied the paying of more than the market price and alleged that plaintiffs' losses had been solely due to poor judgment and inefficiency in the conduct of their business. A verdict for $1 having been returned, judgment and decree were entered awarding treble damages, an attorney fee, and directing that the said defendants "be and they hereby are permanently enjoined and restrained from attempting to drive the plaintiffs herein out of the junk business at Twin Falls, Idaho, and for such purpose, from paying more than the market price for junk at and in the vicinity of Twin Falls where the said defendants are in competition with the plaintiffs herein, and from using or attempting to use or employ any other unlawful or unfair means of competition against the said plaintiffs for the purpose, or which may have the effect of driving the said plaintiffs out of the said junk business at Twin Falls, Idaho."

Defendants appealed from the entire judgment. Later they moved to dismiss the appeal from the money judgment; and, the motion being hereby granted, there remains nothing to consider but the matter of the injunction.

From the evidence it appears that the two defendants, Harry Koppel and Mandel Slatkin, were merely the employees and agents of the defendant, Anna Koppel, sole owner of the Idaho Junk House. As such, their acts in the operation of the business were her acts, and there could

have been neither combination nor conspiracy between the three. The very terms demand concert between individuals or entities maintaining separate and independent interests. This part of the charge having been eliminated, defendants' responsibility under the statute rests upon a determination of whether or not they directed or authorized some act or acts, the specific purpose whereof was to drive plaintiffs out of business.

The acts complained of were the alleged persistent and systematic paying of more than the market price for junk at Twin Falls and vicinity. Prior to the entry of the Idaho Junk House, plaintiffs had the Twin Falls field to themselves, paying such prices as in their judgment the eastern market warranted. Thereafter, the Idaho Junk House was their only competitor. During the succeeding period of something over two years, there seems to have been considerable struggle for business between them. Plaintiffs contend that defendants continually outbid them by offering more than the local market price, and directly threatened to put them out of business. To sustain these charges, they produced evidence of threats, the local market prices, several instances of prices paid and offered by defendants in excess of such market prices, and prices on the eastern market.

The plaintiff, William Udelavitz, testified offhand as to prices on the local and eastern markets, basing his statements on trade quotations and advices, none of which were introduced in evidence. He fixed the local market price by deducting a specified margin from the eastern quotation. On cross-examination, he materially increased these margins from the figures given on direct, in some instances more than doubling them. While testifying to prices paid by defendants, he admitted on cross-examination that he had depended entirely upon what he had been told by others. He did not keep the firm books, did not understand them, but relied upon their disclosures and his independent memory. In his fixation of certain local prices, he was contradicted by his coplaintiff, Samuel Udelavitz, who kept the

448

books, notably in regard to aluminum, the local price of which he said was fourteen cents in 1924, but which Samuel declared to have been eighteen cents. Aside from his testimony was that of six other witnesses.

Ballentyne testified that in 1925 he made defendants a sale of mixed brass for eight cents after respondents had offered him six; he did not testify what the market price was or should have been. E. A. Belleville testified that in 1925 he sold his junk to defendants because they offered him more than plaintiffs offered, but he did not state the price paid. He did say that in January, 1926, defendants offered him seven cents for radiators, when he had theretofore been getting six. Frank Belleville testified that defendants paid for radiators from one-half to one cent more than respondents offered; he did not state the price paid. J. A. Campbell swore that in 1926 defendants offered eight cents for heavy brass and twenty-one cents for aluminum. In 1925 D. D. Reid sold defendants some uncleaned aluminum for seventeen cents. The only witness, aside from Udelavitz, who attempted to show that defendants exceeded the local prices was the witness Wallace, who testified that after defendants entered the Twin Falls field, "in one or two instances there were variations in prices as to lead, in some cases as high as one and one-half to two cents." He was informed as to what he should get for his lead locally by representatives who covered the territory between Twin Falls, Portland and Seattle, and learned the selling price from different battery stations.

At most, this testimony, if conceded to be true, evidenced only a limited number of transactions during the more than two year period; and in no instance was it shown that the prices paid or offered by defendants denied them a profit on the eastern market. It appears from the evidence that the handling of the metals mentioned constituted but a part of defendants' junk business; that prices were constantly fluctuating upon the eastern market, quotations subject to change without notice, and, that success or failure depended greatly upon the judgment exercised by the local dealer in buying and shipping at the right time.

The evidence shows that at times plaintiffs met or outbid the prices offered by defendants. The defendants themselves admitted that at times they misguessed the eastern market and lost profit on their purchases, but they showed by competent evidence, uncontradicted and unimpeached, that they made a handsome profit on their annual business. Nor is it shown in any manner that they did not make a profit upon the volume of particular metals handled during the period. On the contrary, the submitted tabulations of the average price paid for the entire poundage compared with the highest quotations received each month from the Chicago market show a generous margin in defendants' favor, after allowing for substantial slumping between times.

There has been an utter failure to show a persistent or systematic paying of more than what the local market price was or should have been. And, conceding for the sake of argument, that defendants did persistently and systematically outbid plaintiffs in the local market, they had the right to do so, so long as they were, or honestly thought they were, realizing a profit on their entire local business. If, in order to secure business and make profits, one dealer can pay more than his competitor can afford, it is merely the latter's misfortune. He cannot compel the former to adopt a standard essential only to his own success. Competition is the life of trade; and one is not guilty of unfair competition in the eye of the law, unless, with the direct purpose of destroying his competitor's business, he forces prices higher than he can honestly believe will yield a profit when he shall have eventually disposed of the commodities purchased. We find nothing in the record to bring defendants within the rule. The jury's verdict of $1 damages suggests the maxim, *de minimis non curat lex.*

There having been shown no substantial ground for the interposition of equity, the decree awarding the injunction is reversed and the injunction ordered dissolved. Costs to appellants.

Wm. E. Lee, C. J., and Budge and Givens, JJ., concur.